# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### April 27, 2010 Session

## STATE OF TENNESSEE v. MONTGOMERY KOONS

**Appeal from the Criminal Court for Anderson County**
**No. A6CR0318      Donald R. Elledge, Judge**

**No. E2008-02602-CCA-R3-CD - Filed December 14, 2010**

The Defendant, Montgomery Koons, pled guilty to three counts of aggravated statutory rape, a Class D felony. See T.C.A. § 39-13-506(c) (2010). He was sentenced to four years each for the first count and second count as a Range I standard offender and six years for the third count as a Range II standard offender, with all sentences to be served concurrently. The trial court denied judicial diversion and ordered the Defendant to serve one year of incarceration and five years of probation. On appeal, the Defendant contends that (1) the trial court denied his due process right of compulsory process when it quashed his subpoena for the minor victim to testify at the sentencing hearing, (2) the trial judge abused his discretion by declining to recuse himself from the sentencing hearing, (3) the trial court erred by denying his application for diversion based on an erroneous application for certification of eligibility, (4) the trial court erred by denying him full probation, and (5) the trial court erred by entering a Probation Order for six years of probation after one year of incarceration. Because the Defendant was denied his due process right to compulsory process at the sentencing hearing and because the denial of judicial diversion was based on an inadvertently submitted preliminary draft of the application, we reverse the judgments of the trial court and remand for a new hearing, at which the trial court shall consider judicial diversion and if diversion is denied, the manner of service of the Defendant's sentences.

**Tenn. R. App. 3 Appeal as of Right; Judgments of the Criminal Court**
**Reversed and Remanded**

JOSEPH M. TIPTON, P.J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., and J. C. MCLIN, JJ., joined.

David S. Wigler, Knoxville, Tennessee, for the appellant, Montgomery Koons.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; Dave Clark, District Attorney General; Sandra N.C. Donaghy, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

According to the State's recitation of facts at the Defendant's guilty plea proceedings, held on November 8, 2008, the basis for the Defendant's guilty plea was that he was a fifty-year-old man who had sexual relations with the fifteen-year-old female victim[1] "almost every day they were together" during the summer months from June 24, 2006, through September 11, 2006. The Defendant met the victim through his role as a middle school teacher, and at the time of the offenses, he was serving as the victim's mentor with the victim's parents' consent. The three dates alleged in the indictment were taken from the first encounter (June 24, 2006) and the last encounter (September 11, 2006) recorded by the victim on her calendar, plus one date during the time period when the victim noted an encounter with the Defendant (July 1, 2006). The sexual encounters occurred at the Defendant's home in Oak Ridge, and the acts included intercourse, fellatio, and cunnilingus, with three separate sexual acts noted on the last day that the Defendant and victim were together.

At the plea hearing, the Defendant agreed that the facts as recited by the State were true and pled guilty to three counts of statutory rape. The Defendant's partial waiver of sentencing provided that the Defendant would apply for diversion, and if the court denied diversion, he would seek probation. The State opposed diversion on all counts. In a sentencing agreement, the parties agreed that if diversion were denied, the Defendant would receive four years for count one, four years for count two, and six years for count three, to be served concurrently. The State indicated that it would oppose probation on counts one and two but not oppose some form of probation on count three. A sentencing hearing was held on November 17, 2008.

At the sentencing hearing, William Tillery, a licensed clinical social worker, testified as an expert witness in the field of clinical social work and the diagnosis and treatment of sex offenders. Mr. Tillery said that he evaluated the Defendant at the probation office and that he also administered the Substance Abuse Subtle Screening Inventory, the Sexual Adjustment Inventory, the Personal Sentence Completion Inventory, the Molest Scale of the Bumpy Cognitive Distortions, and the Able and Becker Cognitions Scale.

---

[1]Because it is the policy of this court to protect the identity of child victims, we will not identify the victim by name in this opinion.

Mr. Tillery testified that the Defendant reported having sexual contact with a fifteen-year-old girl whom he was counseling. According to Mr. Tillery, the Defendant stated that at the age of eleven, God told him that he needed to dedicate his life to children. The Defendant told Mr. Tillery that he had been in two long-term relationships but had never married and that he ended a relationship because of his desire to work with children.

Mr. Tillery testified that the Defendant described the victim as troubled and that the Defendant said he was trying desperately to save her. Mr. Tillery said that in contrast to the reports that he received from the police and interviews with the victim and her family, the Defendant minimized the sexual contact and said that sexual contact happened only once. Mr. Tillery said that the Defendant described the victim's coming out of the bathroom without her shirt on and that the Defendant asked, "What's a man to do?"

Mr. Tillery testified that the Defendant reported memory loss due to heavy drug use during high school. He said the Defendant reported using drugs while he was teaching until he sought help in 1998. According to Mr. Tillery, police reports indicated that the Defendant used or supplied crack cocaine or marijuana to the victim almost daily. He said the Defendant's substance abuse screening inventory indicated a high risk for drug and alcohol abuse.

Mr. Tillery testified that the Defendant reported having no history of mental illness. He said the Defendant generally fit the profile of a pedophile: never married, narcissistic, a belief that he had been called by God to be around children, and a belief that children could make him happy. Mr. Tillery said his recommendations for the Defendant included registration as a sex offender and significant sex offender treatment. Mr. Tillery said he also recommended that a polygraph test be administered to the Defendant. He said that the polygraph showed "no deception" but that an apparent contradiction existed between the Defendant's claim that he had not used drugs since 1998 and the witnesses who said that he was providing marijuana to children.

Mr. Tillery testified that the Defendant's answers to a cognitive test indicated that he was likely to re-offend. Mr. Tillery said the Defendant agreed with the following five cognitive distortions in the area of his offense: that some children are willing and eager to have sexual activity with adults, that some children can act very seductively, that sometimes victims initiate sexual activity, that people turn to children for sex because they have been deprived of sex from adult women, and that men who molest children really do not like molesting children. Mr. Tillery said that the Defendant was in denial regarding his crimes and that the Defendant blamed the victim and assigned an adult-female role to the victim. He said the Defendant's behavior in continuing to have telephone conversations with the victim after he was under scrutiny was "scary."

Mr. Tillery testified that the Defendant should be able to function on probation if he were supervised and subjected to frequent drug and alcohol testing. He recommended that the Defendant be required to stay away from the victim for life. He said the Defendant scored in the medium-low range on the Static 99 test, which measured the risk of re-offending. He said that in his experience, individuals who were prone to sexually exploiting minors scored low on the Static 99 and that in his opinion, there was a risk to the community that the Defendant would violate rules or boundaries again. He said he did not have any "researchable evidence" that the Defendant was a pedophile.

On cross-examination, Mr. Tillery testified that he had performed about two thousand psycho-sexual evaluations during his career and that he had never found an offender to be at no risk to re-offend because the Tennessee Sex Offender Board considered all convicted sex offenders to be at some risk. He agreed the Sexual Adjustment Inventory was a valid test for predicting an offender's likelihood of re-offending. He agreed the overall result on that inventory showed that the Defendant had few problems with his thoughts and feelings regarding his sex life. He agreed the Defendant had scored in the low risk range for exhibitionism, alcohol, drugs, violence, and anti-social behavior.

Mr. Tillery testified that the Defendant was candid and truthful with him about his past alcohol and drug problems. He said the only firsthand interviews he read in the Defendant's file about the Defendant's supplying drugs to children were interviews with the victim and the victim's sister. He acknowledged he had no way of knowing who was telling the truth about whether the Defendant used drugs or supplied them to children in recent years. He said that in his experience about eighty percent of offenders scored in the low or relatively low range on the Static 99 test and the Sexual Adjustment Inventory. He said that about fifty percent of the offenders he had tested demonstrated cognitive distortions, or thinking errors, and that the interview became especially important in those cases because the offenders were often victims of sexual abuse who learned to defend themselves with cognitive distortions.

Mr. Tillery testified that although the Defendant mentored many young people in the past without complaint of a sexual offense, the fact that he committed a sexual offense with this victim and seemed to think it was a legitimate action put him at greater risk to re-offend. He said the Defendant told him during their interview that he was in therapy with a psychologist. Mr. Tillery agreed he did not interview the victim and did not have any way of determining whether she was exaggerating the number of sexual encounters or whether the Defendant was minimizing them.

Mr. Tillery testified that he did not see anything in the Defendant's file indicating the Defendant had been under the influence of drugs or alcohol while teaching. He agreed that the Defendant passed his polygraph and that the Defendant stated during his polygraph examination that he stopped using drugs and that there were no additional victims. He said he based his testimony that the Defendant had contact with the victim after his arrest on a transcript of a telephone conversation between the two, which the victim had placed with a police officer present.

On redirect examination, Mr. Tillery testified that he had concerns about the accuracy of the Defendant's polygraph. He agreed he considered an offender who met with young people at a coffee shop to be more dangerous to the community than an offender who preyed on a victim within the home.

Dr. John Stuhl, a licensed clinical psychologist, testified for the Defendant. He stated that one of his specialties was treating trauma victims and that he worked with sexual abuse victims. The court accepted Dr. Stuhl as an expert in counseling and psychology but not as an expert in working with "child abuse predators."

Dr. Stuhl testified that he had treated the Defendant since March 2003 for difficulties related to the deaths of loved ones, substance abuse, and Attention Deficit Hyperactivity Disorder (ADHD). He said that he met with the Defendant every other week and that the Defendant never appeared intoxicated at their meetings. He said the Defendant did not suffer from a diagnosable mental illness that would have caused the Defendant to commit the offenses. He said that the Defendant repeatedly talked about his "calling" to help young people who were outcasts and that he talked about being careful and responsible while helping them.

Dr. Stuhl testified that the Defendant felt great remorse for how the relationship with the victim developed and that the Defendant realized he had formed an inaccurate belief that a fifteen-year-old could have a mature relationship. He said that he was never concerned that the Defendant was a predator and that he believed the Defendant to be at a low risk for re-offending. He said incarceration would not serve a rehabilitative purpose.

On cross-examination, Dr. Stuhl testified that he was treating the Defendant at the time of the offenses. He said that during that time, he cautioned the Defendant not to be alone with a young person because he was concerned that the Defendant could be accused of acting sexually toward one of them. He said that after the arrest, the Defendant assured him that he did not contact the victim and reported speaking to the victim by telephone only once when the victim placed the call.

Tennessee Probation and Parole Officer Karen Orsulak testified that she prepared a presence investigation report on the Defendant. She said she interviewed the Defendant, the victim's school principal, the victim's mother, and the victim's father. She said the victim's mother forbade an interview with the victim.

Officer Orsulak testified that the Defendant said he sought mental health treatment due to work stress and took medication in the past to relieve stress and ADHD symptoms. She said the Defendant said he had used cocaine, speed, and marijuana over twenty years earlier and smoked marijuana daily from 1972 to 1980. She said the Defendant reported drinking alcohol regularly until 1998 when he voluntarily joined Alcoholics Anonymous (AA). She said the Defendant reported being clean and sober since 1998.

Officer Orsulak testified that the Defendant said he worked with the victim as part of an after-school program geared toward at-risk children. She said that the Defendant made it clear that the program was separate from school and that he met the children weekly from about 6:00 to 10:00 p.m. at a local restaurant to discuss starting a drama group. She said the Defendant told her that he had oral permission from the victim's parents to take the victim to meetings.

Officer Orsulak testified that the Defendant never married or had children. She said he struggled financially after losing his teaching position. She said the Defendant stated he was a train conductor at an amusement park for a month and lost that job when someone called the amusement park to say he was a sex offender. She said the Defendant worked as a spotlight operator at a theater for three months. She said she recently learned that the Defendant was working around his apartment building in exchange for rent and that he designed jewelry and sold it at a flea market.

Officer Orsulak testified the Defendant said that he felt remorse over his relationship with the victim but claimed that the relationship was consensual and loving. She said the Defendant described times when the victim "hit on" him, particularly a time when the victim came out of the shower. She said the Defendant provided her with love letters and e-mails written to him by the victim. She said that the Defendant provided her with one letter or e-mail he wrote to the victim and that she obtained others from the Defendant's criminal file.

Officer Orsulak testified that the Defendant described the victim as having a troubled childhood and suffering from depression. She stated the Defendant reported that the victim joined AA with him and that he gave the victim rides to AA with her mother's permission. She said the Defendant told her that the victim would come to the school where he taught and also to his house. She said the Defendant stated that he went to the victim's house one time.

Officer Orsulak testified that when she went to the Defendant's home, he had cable television and Internet access, but she did not know if he had e-mail access. She said that in their interview, the Defendant said the number of times he had sexual contact with the victim was fewer than the number given in the police report. She said the Defendant described a secret code he and the victim used in correspondence: 394, meaning three years until the victim would turn eighteen, nine months to be pregnant, and the four children they desired. She said the Defendant stated that he cared deeply for the victim.

Officer Orsulak testified that the Defendant was adamant in saying he never provided drugs to the victim or other children. She said the victim and the victim's sister told police the Defendant gave them marijuana more than once.

On cross-examination, Officer Orsulak testified that she noted in the presentence report that the victim's mother told police the Defendant helped the victim to abstain from using drugs and alcohol. Officer Orsulak said she knew of no other allegations against the Defendant from children in his after-school group. She said that she met with the Defendant once before preparing the presentence report on November 15, 2007, and that she visited his home to follow up in October 2008. She said she administered a drug screen on the Defendant at their first meeting, which was negative. She said that she called the Defendant several times and that he was easy to reach and cooperative.

Officer Orsulak testified that when the Defendant said there were fewer instances of sexual contact with the victim than those represented in the police report, he mentioned one day in particular when one of them was out of town and the victim reported having had sexual intercourse three times. She said the Defendant firmly denied having oral sex with the victim. She said the Defendant never denied his guilt on the three counts of statutory rape.

Jefferson Middle School Principal Bruce Lay testified that the Defendant taught under his supervision. He said he was familiar with the victim and knew she had been in the Defendant's after-school drama group, which was sanctioned by the school. He said he was not sure if the Defendant had been the victim's classroom teacher. He said that any counseling or program the Defendant conducted with students at a coffee shop was outside the principal's jurisdiction. He said that before the allegations surfaced, he and the Defendant had a good working relationship and were friends. He said that he completed formal evaluations of the Defendant's teaching performance twice in ten years and that those evaluations were good. He said the Defendant was an excellent teacher who had "done a lot of good" at the school.

Mr. Lay testified that he first spoke to the Defendant about a possible problem when two teachers expressed concern but that at the time, he had no other information to show wrongdoing. He said that after allegations surfaced, police became involved in the process of putting the Defendant on leave and that he and the Defendant discussed the situation further. He said the Defendant first denied a sexual relationship with the victim but later said he was guilty. He said the Defendant told him several times that he felt he was a victim, too.

Mr. Lay testified that the Defendant was known as a "free thinker" who often approached the line of accepted behavior but had not gone over the line before this incident. He said the Defendant's relationship with the victim began when the Defendant was the victim's mentor at the middle school. He said the Defendant described himself as trying to keep the victim from making mistakes the Defendant made. He said he was familiar with press coverage of the Defendant's case.

On cross-examination, Mr. Lay testified that he had known the Defendant for eight and one-half years and that the Defendant was teaching at the middle school when Mr. Lay joined the staff. He said that he attempted to visit every classroom regularly and that he observed the Defendant's teaching approximately two or three times a week for five or ten minutes each visit. He identified a positive recommendation letter that he wrote for the Defendant during the 2000-01 school year. He agreed that he had a high opinion of the Defendant before this incident and that he never saw the Defendant under the influence of drugs or alcohol. He said no other students had made allegations of misconduct against the Defendant.

Both parties stipulated that the Defendant had not tried to contact the victim since his arrest. The parties stipulated to four excerpts from a recorded telephone conversation that took place between the victim and the Defendant on November 22, 2006. The prosecutor read the following excerpts:

| | |
|---|---|
| Defendant: | Okay, listen to me. |
| Victim: | Uh huh |
| Defendant: | So you listen to me and understand what I'm telling you. |
| Victim: | Uh huh |
| Defendant: | You are not on drugs; we were happy together. For the first time in your life, you were happy. You know that, don't you? |
| Victim: | [crying] |
| Defendant: | Don't let them pollute your mind. |
| Victim: | I won't, I'm sorry, I can't. |

. . .

Defendant: What were you doing?
Victim: I was smoking a whole lot of pot, and we did crack and all that s---.
Defendant: Oh, one time.
Victim: Yeah, but still.

. . .

Defendant: Yes, and it says this little girl still loves you.
Victim: I still love you.
Defendant: We have got too many years together to p--- it all away because of stupidity on both of our ends, so please bear with me. I promise no matter what, things will work out good in the end. Love always, no apologies. Love [victim]. [Victim,] I hold these in my heart. I didn't take this as a joke. I didn't. Listen babe, I didn't take this as a half thing. Do you remember the day I came up there and told you that [Mr. Lay] had talked to me?
Victim: Yeah
Defendant: And you got mad, and you started crying, and you said, "I knew it. I knew you would do this," and I said, "Do what?" I knew you would end it, and I said, "Sweetheart, that is not what I'm doing." I'm telling you that it doesn't matter. What matters is you and me.
Victim: Uh huh
Defendant: And baby, that is all that matters to me, [victim]. I'm willing to wait for you. I'm willing to wait until you turn eighteen. Our numbers: 3, 9, 4. Do you know what my license f---ing plate number is?
Victim: What?
Defendant: The new one that I got from the state after you were gone?
Victim: Is it 394?
Defendant: 934

. . .

| | |
|---|---|
| Defendant: | Now, that's where things are, and that's the truth, and I can prove it. They can't prove anything. You know why? Because they are lying to you, and [victim], what did I tell you? If they say something to you, look at them and say, "Well, if you know the story, why are you asking me?" or "Why don't you tell me what you know, and I'll fill in the rest." |
| Victim: | Uh huh |
| Defendant: | If you want to catch them in their lies, that is how you do it. You've probably already given them enough information though. |
| Victim: | [inaudible] I saw it on the news, and it kills me about all this s--- and like you were there [inaudible]. And they tried to interview you, and you wouldn't say anything and this s---. |
| Defendant: | They didn't play the whole thing though. |
| Victim: | Baby, I gotta' go; my parents just pulled into the driveway. |
| Defendant: | You get back in touch with me as soon as you can. |
| Victim: | Uh huh |
| Defendant: | Okay, call [. . .], and we will arrange a meeting. |
| Victim: | Okay |
| Defendant: | It will be safe. |
| Victim: | Are you sure? |
| Defendant: | I know, [victim], I love you. Say it, say it. |
| Victim: | To reassure you or myself? |
| Defendant: | I know you love me. |
| Victim: | It hurts too much. |
| Defendant: | Then you do love me, sweetie. |

Oak Ridge Police Detective Ron Boucher testified that he was the primary investigating officer for this case and the prosecuting officer before the grand jury. He said that he was aware of press coverage and that he recognized members of the press in the courtroom. He said he was aware of two other cases in the area involving teachers accused of sexual relationships with minors.

On cross-examination, Detective Boucher testified that he interviewed the victim on September 14 and September 22, 2006. He said that during the first interview, the victim said the Defendant had sexual relations with her multiple times but did not claim any drug use. He said that during the second interview, the victim said she used marijuana with the Defendant.

On redirect examination, Detective Boucher testified that the victim said there were more than twenty instances of sexual contact with the Defendant. He said the victim also said the Defendant gave her marijuana and crack cocaine.

On recross-examination, Detective Boucher testified that he requested a warrant to search the Defendant's home for letters between the Defendant and victim. He said he did not ask to search for drugs and did not ask the Defendant if there were any in the house.

Audrey Collins testified that she grew up with the Defendant in their Oak Ridge neighborhood and that her son was a student in the Defendant's fifth grade class. She said that while growing up, she never knew the Defendant to behave inappropriately or in a sexual way with her or other children. She said that when she was growing up, the Defendant was a big brother figure in the neighborhood and protected younger children from bullying.

Ms. Collins testified that since 2000, she stayed in touch with the Defendant through his younger brother and that she visited the Defendant at school when he was her son's teacher. She said the Defendant was an excellent teacher who encouraged at-risk students, including her son with ADHD, who benefitted from the Defendant's individual attention. She said she never saw the Defendant under the influence of alcohol or drugs. She said she knew of the Defendant's having had two girlfriends and that she did not believe the Defendant was a predator or a threat to children. She said the Defendant expressed remorse to her about his relationship with the victim.

Roger Toler testified that he was a former teacher who taught with the Defendant at Woodland Elementary School for six or seven years. He said that he knew the Defendant for about twenty-five years and that he and the Defendant taught as a team and sometimes shared the same classroom. He said he hired the Defendant to teach in a summer school program that he administered. He said that the Defendant was diligent in working with students who needed extra encouragement and that he was often successful with students others had stopped trying to help. He said he never saw the Defendant under the influence of drugs or alcohol.

-11-

Mr. Toler testified that when this incident surfaced, the Defendant called him and remorsefully admitted making a mistake and having a relationship with the victim. He said that the Defendant had helped with a youth program at a church and that he knew of no allegations of misconduct against the Defendant at the church. He said the Defendant sometimes went to a monastery to find peace with himself and connect to God. He said prison would not serve an educational purpose for the Defendant.

On cross-examination, Mr. Toler testified that other educators could be deterred if the Defendant went to prison. He agreed that educators occupied a position of public trust and that in his experience, once he had a teacher-student relationship with a child, the teacher-student dynamic remained if he saw the former student in later years.

On redirect examination, Mr. Toler testified that the Defendant had been punished through losing his teaching credentials and experiencing financial difficulty. He said other teachers would be deterred from similar behavior by seeing the destruction of the Defendant's livelihood and professional reputation.

Tyler Guilliams testified that he was eighteen years old at the time of the hearing and that he lived in Oak Ridge from 1997 to 2007. He said the Defendant was his teacher for one summer school class after fifth grade and the director of a play in which he performed the lead in the eighth grade. He said the Defendant helped him deal with difficulty at home and was the first adult who listened to him and treated him like a human being. He said he often met with the Defendant and other students after the play was over as part of an after-school drama club and later as a group of friends.

Mr. Guilliams testified that he and others shared an idea to form a "coffee shop thing" called the "outer circle" for Oak Ridge youth and that the Defendant was part of the group. He said members of the group tended to be "misfits" and young people interested in drama. He said the victim became a member of the group after it stopped being a drama club. He said he never saw the Defendant behave inappropriately with students. He said that several members of the group used drugs and alcohol but that he did not. He said he never saw the Defendant under the influence of or encouraging group members to use drugs or alcohol. He said members of the group tried to help each other stop abusing substances.

Mr. Guilliams testified that he had known the victim most of his life and that she once considered him her best friend. He said the victim confided that she was a victim of abuse at home and that she had a history of drug and alcohol abuse. He said he asked the Defendant to intervene when the victim began using drugs and alcohol more heavily and became negative and suicidal. He said that after the Defendant intervened, the victim's self-

esteem improved and that she attended AA with the Defendant. He said all of the young people in the group were influenced positively by the Defendant.

Mr. Guilliams testified that the victim talked to him about the case after the Defendant was arrested. He said that he thought the victim was untruthful with police because she was angry due to her belief that the Defendant made disparaging remarks about her to the police. He said that he also spoke to the Defendant about the case and that the Defendant was remorseful and deeply humiliated. He said that he never helped the Defendant contact the victim after the Defendant's arrest and that he did not know of any time that the Defendant tried to contact the victim. He said he did not view the Defendant as a predator.

On cross-examination, Mr. Guilliams testified that he spoke with the victim by telephone three or four times since the Defendant's arrest but that he had not sent her messages by e-mail or text. He said he discussed the case "only very lightly" with former classmates who were still at school in Oak Ridge and that he never asked any of them to contact the victim.

Josh Posh testified that he was thirty-four years old at the time of the hearing and that he had known the Defendant all his life. He said that although he was currently unemployed, he was a licensed mental health nurse practitioner. He said that his father and the Defendant were friends who attended school together. He said he and his older sister stayed at the Defendant's home occasionally when they spent summers with their father while growing up. He said he never knew the Defendant to behave inappropriately toward his sister.

Mr. Posh testified that the Defendant remained like an uncle to him and that they often spent time together. He said he chaperoned one field trip for the Defendant's class. He said that he would often see former students warmly greet the Defendant in public and that he never saw the Defendant behave inappropriately toward a student or former student. He said that although he was shocked by the Defendant's admission of statutory rapes, he still felt that the Defendant was like an uncle to him. He said the Defendant had been punished by the media.

Iva Patterson testified that she met the Defendant through AA and that she had known him for five or six years. She said that during the summer of 2006, she was the treasurer of their AA chapter and that she saw the Defendant at most of the five or six meetings she attended each week. She said that the Defendant brought students to AA on several occasions and that he brought the victim at least six times during the summer of 2006. She said that in the meetings, the victim shared problems, including peer pressure at school, drug and alcohol abuse, and an unhappy home life. She said the Defendant spoke to her about two long-term relationships in which he was involved with adult women.

Ms. Patterson testified that the Defendant admitted his relationship with the victim to her after the allegations become public. She said the Defendant told her that he made a mistake and that he really cared about the victim and hated that she was being hurt. She said that she never saw the Defendant under the influence of drugs or alcohol and that she had no concerns that the Defendant would re-offend.

On cross-examination, Ms. Patterson testified that the Defendant was attending AA meetings in another town at that time because he was no longer comfortable at the Oak Ridge meetings. She agreed that recovery from addiction was an ongoing process and that relapses occurred.

At the close of the hearing, the trial court ruled that the Defendant was ineligible for diversion based on the TBI application for certification of eligibility filed by the Defendant. The trial court sentenced the Defendant to four years each for the first count and second count as a Range I standard offender and six years for the third count as a Range II standard offender. The court denied full probation and ordered the Defendant to serve one year in the Anderson County Jail and six years' probation, surrender his teaching license, comply with the sex offender registration and monitoring requirements, have no contact with the victim, and pay court costs. This appeal followed.

# I

The Defendant contends that the trial court erred in granting the State's motion to quash his subpoena of the victim to testify at the sentencing hearing. He argues that he was denied his constitutional right of compulsory process when he was unable to present the victim's testimony. The State contends that the Defendant has not shown that the trial court abused its discretion in quashing the subpoena. We agree that the Defendant was denied his right of compulsory process and that a new sentencing hearing is required.

The record reflects that the Defendant subpoenaed the victim to testify at the sentencing hearing, and the State moved to quash the subpoena. The State did not offer proof at the hearing on the motion to quash. The State argued that the minor victim should be protected from further harm, which it said might occur if she testified. The prosecutor noted that the victim had a history of mental health issues and "was a troubled child." The prosecutor noted that defense counsel received a letter purportedly written by the victim, which expressed her desire that the Defendant not receive a jail sentence and stated that she was tired of being swayed by her family. The State contended that the letter the victim wrote to defense counsel was a satisfactory substitute for the victim's testimony. Defense counsel stated that the victim also called his office repeatedly but that he had not spoken with her. He said he did not know whether the victim's parents permitted her to call his office. The

defense noted that the victim impact statement in the presentence report contained the statements of a school principal and the victim's mother but not of the victim.

In ruling on the matter, the trial court stated that the victim's wishes with respect to the Defendant's sentencing were not material. The court noted that based upon the facts recited at the plea hearing, the Defendant's and the victim's sexual relationship, and their use of drugs provided by the Defendant, it did not see how the victim's testimony "could greatly add or take away from [the sentencing hearing]." The court quashed the subpoena but ruled that the victim would be permitted to testify with her mother's permission. The court stated that its reasons for quashing the subpoena were that (1) the victim was a "troubled child," (2) the victim was seventeen years old and the events occurred when she was fifteen years old, (3) the victim's involvement with the Defendant would not have happened had the victim not already been having problems with her parents, and (4) the victim was receiving mental health treatment. The court allowed the victim's letter to be filed under seal.

A trial court's discretion in quashing a subpoena is limited to situations in which there is an abuse of process. Bacon v. State, 385 S.W.2d 107, 109 (Tenn. 1964). If a witness's testimony would be immaterial, the court may act to avoid abuse of process. State v. Womack, 591 S.W.2d 437, 443 (Tenn. Ct. App. 1979). Otherwise, a trial judge has no discretion to control a defendant's ability to subpoena witnesses. Bacon, 385 S.W.2d at 109. The moving party has the burden to show that the issuance of the subpoena would be an abuse of process. Womack, 591 S.W.2d at 443. The trial court's decision is reviewable for abuse of discretion. See e.g., id. at 446 (applying an abuse of discretion standard); State v. Burrus, 693 S.W.2d 926, 929 (Tenn. Crim. App. 1985) (applying an abuse of discretion standard); see also State v. Connie Easterly, No. M2000-00077-CCA-R3-CD, Sequatchie County, slip op. at 8 (Tenn. Crim. App. Mar. 1, 2001).

Among the rights afforded a criminal defendant is the "right . . . to have compulsory process for obtaining witnesses in his favor." U.S. Const. amend. VI; Tenn. Const. art. I, § 9; T.C.A. § 40-17-105; see State v. Brown, 29 S.W.3d 427, 432 (Tenn. 2000); see also Chambers v. Mississippi, 410 U.S. 284, 302 (1973) ("Few rights are more fundamental than that of an accused to present witnesses in his own defense."). In the context of compulsory attendance of witnesses, the Supreme Court has observed:

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their

testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

Washington v. Texas, 388 U.S. 14, 19 (1967). Sentencing is a critical stage of the proceedings at which a defendant's constitutional rights must be protected. See Mempa v. Rhay, 389 U.S. 128 (1967); State v. Michael Harlan Byrd, No. 01C01-9609-CC-00411, Giles County, slip op. at 15 (Tenn. Crim. App. May 1, 1998).

The foundation of a claim of denial of compulsory process is that the witness or the evidence the Defendant seeks to offer is material to the defense. See, e.g., United States v. Valenzuela-Bernal, 458 U.S. 858, 867 (1982) (holding that a defendant who attempts to establish a violation of his constitutional right to compulsory process "must at least make a plausible showing of how [the witness's] testimony would have been both material and favorable to his defense"); State v. Smith, 639 S.W.2d 677, 680 (Tenn. Crim. App. 1982) (stating that "the constitutional right to compulsory process requires such process for, and only for, competent, material, and resident witnesses whose expected testimony will be admissible"); Womack, 591 S.W.2d at 443 (reciting rule that trial court may abate subpoenas of witnesses whose testimony would be immaterial); Bacon, 385 S.W.2d at 109-10 (holding that a defendant is entitled to compulsory process of witnesses upon showing of materiality of witnesses' testimony); State v. Alvin Glenn Hughes, No. 03C01-9208-CR-0018-00183, Shelby County, slip op. at 9-11 (Tenn. Crim. App. June 9, 1993) (observing that a defendant has a fundamental constitutional right to compulsory process of a witness at trial upon showing the witness is material and that a trial court has no discretion in issuing process).

The Rules of Evidence provide that a person is presumed to be a competent witness unless otherwise provided by rule or statute. Tenn. R. Evid. 601. There is a rebuttable presumption of the competency of witnesses who are less than fourteen years old. State v. Campbell, 904 S.W.2d 608, 612 (Tenn. Crim. App. 1995). The victim in the present case was seventeen years old at the time of the hearing on the motion to quash.

Although the State had the burden of proof at the hearing, no evidence was received to show that the victim was not a competent witness, such as the testimony of a parent or a mental health treatment provider with some knowledge of the victim's situation and the probable effect of her testifying at the sentencing hearing. The court accepted as fact the State's assertions regarding the victim and the need to protect her. The trial court also relied on the victim's status as a minor to justify its ruling. The seventeen-year-old victim was presumed to be a competent witness. See Tenn. R. Evid. 601. The trial court stated repeatedly that the victim could testify only with her parents' consent. We are unaware of any rule that places minors beyond process of the court without parental consent. At the

-16-

sentencing hearing, held after the trial court had quashed the subpoena, testimony and information from the presentence report indicated the victim's troubled past. However, this evidence was not presented at the hearing on the motion to quash the subpoena, and even if it had been, there was no proof presented that the victim was incompetent to testify due to her age or mental health. We conclude that the trial court did not require the State to shoulder the burden of proof at the hearing.

The trial court also based its ruling on the motion to quash on the lack of relevance of the victim's testimony. The court did so, however, without hearing the victim's testimony, and its quashing of the subpoena denied the Defendant the opportunity to make an offer of proof. A review of the issues that faced the trial court at the sentencing hearing is instructive. First, the trial court's ruling on the Defendant's application for judicial diversion required the court to consider the circumstances of the offense and whether judicial diversion would serve the ends of justice. See, e.g., State v. Electroplating, Inc., 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998). Upon denying diversion and sentencing the Defendant, the trial court's considerations included "[t]he nature and characteristics of the criminal conduct involved" and any evidence offered by the parties that was relevant to the mitigating and enhancement factors. T.C.A. § 40-35-210(b)(4), (5) (2006) (amended 2009). There was no trial in this case, and at the plea hearing, very limited facts taken from an officer's report were recited by the assistant district attorney as the basis for the Defendant's guilty pleas. At the hearing on the motion to quash, the trial court stated that due to the evidence of the sexual relationship between the Defendant and the victim and their drug use, nothing the victim had to say would influence its determination of the proper sentence. This statement shows that the court considered the nature and characteristics of the Defendant's criminal conduct to be conclusively established, even before the sentencing hearing. The Defendant was foreclosed from presenting proof through the victim's testimony that might have addressed relevant considerations for the trial court's decisions regarding diversion and sentencing. We conclude that the victim's testimony was relevant and material, that the trial court erred in quashing the defense subpoena, and that the Defendant must receive a new sentencing hearing.

## II

The Defendant contends that the trial judge erred by not recusing himself from presiding over the sentencing hearing after expressing his concern that defense counsel had a conflict of interests in representing both the Defendant and a probation officer who prepared the presentence report. The Defendant claims that the trial court questioned him in a "hostile" manner about the possible conflict and "repeatedly expressed his 'incredulity' that defense counsel had acted ethically." The State contends that the trial judge did not abuse his discretion. We agree with the State.

-17-

A defendant has a fundamental constitutional right to a fair trial before an impartial tribunal. See, e.g., State v. Austin, 87 S.W.2d 447, 470 (Tenn. 2002). The Code of Judicial Conduct provides:

> **E. Disqualification**
> (1)    A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where:
>
> (a)    the judge has a personal bias or prejudice concerning a party or a party's lawyer[.]

Tenn. R. Sup. Ct. 10, Canon 3(E)(1)(a).

When a question of a trial judge's ability to be impartial arises, a trial judge should grant a recusal whenever the judge "has any doubts about his or her ability to preside impartially" or "when a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality." Alley v. State, 882 S.W.2d 810, 820 (Tenn. Crim. App. 1994); see also Tenn. S. Ct. R. 10, Canon 3(E). "A court should examine the facts alleged by the movant and consider 'whether assuming the truth of the facts alleged, a reasonable person would conclude that a particular judge is biased or prejudiced against a particular defendant.'" Alley, 882 S.W.2d at 821 (quoting United States v. Baker, 441 F. Supp. 612, 616 (M.D. Tenn. 1977)). "Not every bias, partiality, or prejudice merits recusal. To disqualify, prejudice must be of a personal character, directed at the litigant, 'must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from . . . participation in the case.'" Id. at 821 (quoting State ex rel. Wesolich v. Goeke, 794 S.W.2d 692, 697 (Mo. Ct. App. 1990)). "Adverse rulings by the trial court are not usually sufficient grounds to establish bias. Rulings of a trial judge, even if erroneous, numerous and continuous, do not, without more, justify disqualification." Id. at 821. The issue to be determined is not "the propriety of the judicial conduct of the trial judge, but whether he committed an error which resulted in an unjust disposition of the case." State v. Boggs, 932 S.W.2d 467, 472 (Tenn. Crim. App. 1996). The matter of recusal is left to the sound discretion of the trial court and will not be reversed on appeal absent an abuse of that discretion. Id.

In the present case, the trial judge became concerned about defense counsel's representing the Defendant while also representing the probation officer who prepared the presentence report. It is undisputed that defense counsel's representation of the probation

officer was unrelated to this case. When the judge learned of the dual representation, he contacted the Board of Professional Responsibility to request advice. A telephone conference occurred with the Board's disciplinary counsel, the trial judge, and the attorneys. During the conference, which is not transcribed in the record, there was an exchange between defense counsel and the trial judge in which the judge asked defense counsel whether he had obtained information from his probation officer for the benefit of the Defendant. Defense counsel did not answer immediately, and the trial judge repeated the question multiple times. By his own admission, the trial judge became angry when defense counsel did not respond to his inquiry.

The defense then challenged the trial judge's impartiality to conduct the sentencing hearing. Defense counsel stated in a letter to the Board, which is part of the record, that he attempted to answer the question by explaining but that he could not fairly give a "yes" or "no" answer. He said the judge insisted that he answer "yes" or "no." He said he "understood [the judge] to say that [his] reluctance to answer . . . was an indication of untruthfulness and that we were going to have problems [at the sentencing hearing] if [he] was representing [the Defendant] in [the judge's] court." He said that after disciplinary counsel for the Board left the conference call, the judge said that he "would not be able to sleep at night if he was in [defense counsel's] position going forward at this sentencing hearing."

Four days later, the court held the hearing on the Defendant's motion for an interlocutory appeal and motion to continue. Although these motions pertained to the trial court's order quashing the victim's subpoena, the conference call exchange between defense counsel and the trial court was addressed at the beginning of the hearing. The trial judge addressed allegations in defense counsel's letter to the Board, acknowledging that he became frustrated the third time he questioned defense counsel. The trial judge said it was at this point he stated that the question could be answered with "yes" or "no." The trial judge disagreed that he said defense counsel's credibility was in question. He recounted having said that if defense counsel were a witness under oath and evaded questions, defense counsel's credibility would be questioned. The judge said he also acknowledged that defense counsel was not under oath. The judge stated that he was "incredulous" when disciplinary counsel said there was no appearance of impropriety in the dual representation but that he was not "upset at" defense counsel. The trial judge acknowledged that he said something about not being able to sleep at night if he were in defense counsel's position and explained, "that's the way I practiced law." The trial judge disavowed being upset with defense counsel over the matter. Defense counsel responded that he was concerned on behalf of the Defendant that the trial judge had formed an opinion about defense counsel's credibility or truthfulness. The trial judge again denied that he questioned defense counsel's credibility and denied having any bias against defense counsel. The judge said his statement about

-19-

defense counsel's credibility being questioned if counsel were under oath was "an example" of how a credibility issue might arise and that he had no issue with defense counsel's credibility. With respect to the judge's factual assertions, the assistant district attorney agreed that the judge's recounting of the conference call was accurate.

In the present case, the Defendant has not shown that the trial judge abused his discretion by not recusing himself from presiding at the Defendant's sentencing hearing. The record reflects that there was less dispute about the facts of the conference call than about defense counsel's interpretation of them. The trial judge explained his statements from the conference call and placed them in context, and he disclaimed any credibility questions about defense counsel or having any bias against defense counsel that might affect the Defendant. The Defendant is not entitled to relief on this issue.

### III

The Defendant contends that the trial court erred by denying his application for judicial diversion based on an erroneous application for certification of eligibility. The Defendant argues that if this case is remanded, the trial court should be ordered to consider the correctly filed diversion application. The State argues that because the Defendant did not raise an objection to the court's denial of diversion during the sentencing hearing, he waived the issue on appeal. We agree with the Defendant that on remand, the trial court should consider the Defendant's diversion application de novo.

At the sentencing hearing, the trial court noted that no Tennessee Bureau of Investigation (TBI) diversion report was in the court file. According to defense counsel's affidavit, filed after the hearing, he had taken over the case from the attorney who filed the diversion application and had been told by the court at an earlier hearing that the court had a copy of the diversion report. At the sentencing hearing, defense counsel searched the Defendant's file while in court and found two completed diversion application forms. He gave one to the court and one to the prosecutor, not realizing that the two forms were two different versions and that he had given the trial court an inaccurate copy.

At the close of the hearing, the trial court found that the Defendant was ineligible for diversion because the application stated that he had a felony or misdemeanor conviction. The form on which the trial court relied is in the record and has the box checked by "The defendant has a prior disqualifying felony or misdemeanor conviction." After the hearing, defense counsel contacted the prosecutor, who sent a copy of the correct version to defense counsel. The Defendant filed the corrected TBI diversion report and an explanatory affidavit on December 4, 2008. The corrected report is in the appellate record and has the box marked

by "The defendant has not had a prior disqualifying felony or misdemeanor conviction." It is undisputed that the Defendant had no criminal record prior to these convictions.

A defendant is eligible for judicial diversion if he or she is convicted of a Class C, D, or E felony or lesser crime, excluding certain sexual offenses not involved in this case, driving under the influence, and vehicular assault, and if he or she has not been previously convicted of a felony or a Class A misdemeanor. See T.C.A. § 40-35-313(a)(1)(B)(I) (2006) (amended 2007). Judicial diversion allows the trial court to defer further proceedings without entering a judgment of guilt and to place the defendant on probation under reasonable conditions. T.C.A. § 40-35-313(a)(1)(A). When the probationary period expires, if the defendant has completed probation successfully, the trial court will dismiss the proceedings against the defendant with no adjudication of guilt. See T.C.A. § 40-35-313(a)(2). The defendant may then apply to have all records of the proceedings expunged from the official records. See T.C.A. § 40-35-313(b). A person granted judicial diversion is not convicted of an offense because a judgment of guilt is never entered. See T.C.A. § 40-35-313(a)(1)(A).

When a defendant challenges the manner of serving a sentence, this court conducts a de novo review of the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." T.C.A. § 40-35-401(d) (2010). However, when the accused challenges the trial court's denial of a request for judicial diversion, a different standard of appellate review applies. Because the decision to grant judicial diversion lies within the sound discretion of the trial court, this court will not disturb that decision on appeal absent an abuse of discretion. Electroplating, 990 S.W.2d at 229. Upon review, we will give the trial court the benefit of its discretion if "'any substantial evidence to support the refusal' exists in the record." State v. Anderson, 857 S.W.2d 571, 572 (Tenn. Crim. App. 1992) (quoting State v. Hammersley, 650 S.W.2d 352, 356 (Tenn. 1983)).

In determining whether to grant judicial diversion, the trial court must consider (1) the defendant's amenability to correction; (2) the circumstances of the offense; (3) the defendant's criminal record; (4) the defendant's social history; (5) the defendant's physical and mental health; (6) the deterrence value to the defendant and others; and (7) whether judicial diversion will serve the interests of justice, those of the public as well as the accused. Electroplating, 990 S.W.2d at 229; State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996). In addition, "the record must reflect that the court has weighed all of the factors in reaching its determination." Electroplating, 990 S.W.2d at 229. If the trial court refused to grant judicial diversion, it should state in the record "the specific reasons for its determinations." Parker, 932 S.W.2d at 958-59.

The trial court based its denial of diversion on the inaccurate TBI application for certification of eligibility and therefore did not explicitly weigh the diversion factors. The State argues that the Defendant waived the issue of the inaccurate form by not objecting to its admission at the sentencing hearing. Defense counsel was under the mistaken belief that the court was examining an accurate copy of the eligibility form and states in his appellate brief that he was "shocked" when the court found the Defendant ineligible due to a disqualifying prior conviction.

Tennessee Rule of Appellate Procedure 36(a) states that appellate relief is generally not available when a party has "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." See, e.g., State v. Sims, 45 S.W.3d 1, 16 (Tenn. 2001). Although defense counsel should have objected when the trial court ruled that the Defendant was ineligible for diversion due to a prior disqualifying conviction, counsel attempted to correct the error a few days later and raised the issue on appeal. We conclude that the Defendant's eligibility for diversion should be examined on the merits rather than denied on the basis of an erroneous form.

The Defendant concedes that the trial court's ruling against full probation meant that the court would have ruled against diversion even if it had been viewing a correct TBI eligibility application. After the eligibility requirement is met, the factors considered for diversion are generally included in the factors considered for full probation. See T.C.A. §§ 40-35-102 (2006) (amended 2007), -103 (2010); Electroplating, 990 S.W.2d at 229; State v. Kristi Dance Oakes, No. E2006-01795-CCA-R3-CD, Sevier County, slip op. at 13 (Tenn. Crim. App. Sept. 27, 2007), app. denied (Tenn. Mar. 3, 2008). We agree that based on the trial court's evaluation of alternative sentencing considerations and denial of full probation, the trial court would have denied diversion even if considering the correct eligibility application. On remand, however, the Defendant will have the opportunity to subpoena the victim. We conclude that the trial court should also rule on whether to grant judicial diversion with an updated TBI application for certification of eligibility.

**IV**

The Defendant contends that the trial court erred by denying him full probation because it did not adequately consider sentencing principles and mitigating factors applicable under the Tennessee Criminal Sentencing Reform Act of 1989. The State contends that the trial court properly denied full probation after duly considering applicable sentencing factors and principles. Our reversal of the judgments and remand of this case for a new sentencing hearing mean that the Defendant will be able to subpoena the victim as a witness and that both sides may present relevant evidence not currently in the record. We need not address the trial court's denial of full probation because that denial was based on evidence presented

at a hearing at which the Defendant was denied his right to the compulsory process. See, e.g., State v. Cannon, 254 S.W.3d 287, 307 (Tenn. 2008) (having determined that the defendant was entitled to a new trial based on the erroneous admission of evidence in violation of his right to confrontation, the court concluded that it would not review the effect of that evidence's admission at the first trial).

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. T.C.A. §§ 40-35-401(d), -402(d) (2010). In conducting a de novo review, one of the components we must consider is any evidence received at the sentencing hearing. See T.C.A. §§ 40-35-102, -103, -210; State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991); State v. Moss, 727 S.W.2d 229, 236 (Tenn. 1986). Because the evidence at this sentencing hearing lacked testimony that the Defendant had a right to compel, a de novo review of the sentencing would be premature.

## V

As the Defendant notes, the trial court's Probation Order reflected a sentence of seven years, with six years of probation after one year of confinement. This does not accurately reflect the total sentence of six years.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are reversed and this case is remanded for a new sentencing hearing, at which the trial court shall consider judicial diversion and if diversion is denied, the manner of service of the Defendant's sentences.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE

-23-